# CIRCUIT COURT OF BALTIMORE CITY.

Filed June 21, 1928.

FRANK CATE
VS.
CHARLES D. GAITHER, POLICE COMMISSIONER, BALTIMORE CITY.

*Richard E. Preece* and *Robert F. Leach, Jr.*, for complainant.

*Willis R. Jones*, Assistant Attorney-General, for Commissioner of Police.

O'DUNNE, J.—

I have listened with interest and attention today to the testimony and argument on the evils of gambling. Tonight I have reread the authorities cited by counsel, as well as the case, not cited, of Rhode Island vs. Certain Gambling Instruments, reported 38 A. L. R. 71, in which *all* the cases are reviewed in the annotation thereto.

There is no disposition of this Court to minimize, in the slightest degree, the public evil of gambling, whether viewed in its pettiest forms, or in its more gross development, in Wall Street. To trace the origin and history of gambling would be to give a detailed account of the human race from its creation to its extinction.

Mythology tells us that on high Olympus the goddess *"Fortune"* became enamoured of the god *"War."* They had a deformed daughter with a hideous face, and a frog's body, called *"Gaming,"* and she refused all playthings, save *dice.* Her mother, Fortune, loved the hideous child, built palaces for her in which to indulge her desire for gaming. In spite of her hideous appearance, she possessed strange powers of *fascination,* and crowds of lovers ever followed her and sought her hand. She gave birth to twins, one an idiot named Duelling, the other a lunatic, named *Suicide.* The immortal family has ever since multiplied its kind. They have populated the globe, and her cousins in Baltimore are legion.

In some magazine, years ago (name and date of which I know not), Alfred Henry Lewis gave a graphic description of the history of gambling. He showed that black, red, yellow and white races, both civilized and barbarous, all have had their element of *gamblers.* Cheating, swindling, lying and roguery, with murder and foul crimes, are the hand maids of gambling. While the passion for gambling is never wholly suppressed, the methods of indulgence vary. Then as now, laws were passed to curb the evil. China, India, Egypt, Persia, Greece and Rome all had their primitive methods of search, seizure and punishment. They failed to eradicate this evil. The blood of the victims was the seed of the sport. Some think the Pyramids of Egypt were piled up by the sweat and toil of *convicted* gamblers. We never get enough gaming convicts here to build one. The gambling evil has been condemned by the laws of all countries in all ages, by the Jews, by the Christians and by the Hindu law. We read in Al Koran "Satan seeketh to sow dissension and hatred among you by means of wine and *lots,* and to divert you from remembering God." (Koran, Ch. V.) Neither the law, God, man nor the prophets, has suppressed the passion for gambling, which will endure as long as human nature is human. Ptolemy combined public business with private pleasure, and would try criminals while rattling the dice box, and measure his sentences of death or long penal servitude according to the numbers that were turned up on each throw. We have at least passed that stage in history. Nero gambled like a madman, Claudius like a fool.

The degradation to which gambling leads is vividly portrayed for mankind in the magic pencilings of Gustave Dore. Gross sensuality, its usual companion, is graphically traced by Hogarth in "The Rake's Progress" and in the "Harlot's Progress," and its general corruption of the body politic and of the human race is shown in his sketch, "The Lottery," representing "Brittania" receiving enriching showers from herself (in the form of State lottery). Fortune drawing the blanks and prizes. Wantonness drawing the numbers. Suspense turned to and fro by "Hope" and "Fear." "Good Luck," elated, is seized by "Pleasure" and "Folly." Fame persuades him to raise sinking Virtue. Misfortune, oppressed by Grief, points to the sweets of *Industry.* Sloth is hiding his head in the curtain. Avarice is hugging his money. Fraud is tempting Despair with money at a trap door in the pedestal. From the beginning of time the gambler has been a human parasite, preying upon mankind. He eats, drinks and requires shelter, but is a drone in the human hive, a bloodsucker closely allied with the criminal and the outlaw, against whom society is ever at war.

Some of the inmates of our jails and penitentiaries serve as mute exhibits, and in their wake we find wrecked homes, sad, broken, working women, toiling in factories, children deprived of education and their chance in life, because of mad reckless flings of

gambling husbands, all of which is but *part* of our social ills.

Without, therefore, in the least minimizing the evil, we must address ourselves to the record of this case to ascertain whether the device, the subject matter of this suit, comes within the prohibition, or whether the interference and continued *threatened* interference, by the police department, is an invasion of the right of private property.

The bill in its eighth paragraph charges that on September 15th, 1927, the defendant, Charles D. Gaither, Police Commissioner, his captains, lieutenants, sergeants and police acting under his direction, notified complainant and his lessees that they will not be permitted to use, operate or maintain his vending machines in the City of Baltimore, and the defendant commissioner has ordered all of said machines to be *seized* and *confiscated.*

The Attorney-General in his answer to the said 8th paragraph admits the allegations of paragraph 8, and contends that they are *"gambling machines"* within Sec. 244-46, Sec. 252-255, Art. 27, Code.

Complainant elsewhere in his bill, says he has $10,000 invested in these candy or mint vending machines, and $1,000 in merchandise to be sold through these machines, as vending mediums. The machine is a box, something like a large cash register in general appearance. Through the glass front is visible the character of merchandise with which it is loaded, in this instance, small cylinders of mint wafers, about the size and length of one's middle finger, each package marked to retail at 5 cents, and costing in $1,000 purchases, wholesale, one and on-quarter cents, to the complainant.

On top of the box is a slot in which to deposit a nickel. To the right of the box is a side lever to release the coin which when it falls, releases one cylinder of the merchandise to a lower tray, which in turn requires moving a small wheel or catch, to throw the merchandise from the tray to the hand of the purchaser. Directions for operation are plainly printed on the face of the machine (similar to directions on a slot telephone pay station). In addition to the foregoing, and under a glass slide, is an indicator resembling the speedometer on a motor. This indicator automatically sets itself with the let-

ters "No" (meaning no checks will come), or the figures 2, 4, 6, 8, 10, 12, 16 or 20. These are plainly visible before the nickel is deposited. If any of the figures appear in the dial it means that in addition to uniform quantity of merchandise the machine at the time of delivery of the merchandise, will also throw out certain slugs or checks the size of a nickle, yellow in appearance, but not brass, with a hole in the middle of them, like an ordinary washer, and on these yellow checks is embossed on one side the words in raised letters, "For amusement only." On the other side "of no value, not redeemable." There is no proof in this case that any of these checks are redeemed either in money or in merchandise or otherwise, by the owner or his lessees of such machines or agents. It is suggested or insinuated in argument and by attempted atmospheric developments to create the impression that perhaps these checks are redeemed when the police are not around. Evidence is offered to show that the telephone slot machines or pay stations are grossly polluted by these and other slugs of similar size. There is also evidence that metal washers of the same size are purchasable in ordinary hardware stores. The vending machines are made by the Mills Manufacturing Co. of Chicago, cost complainant $100 each. They come equipped with a bag of 100 or more of these disks or checks so embossed as aforesaid. In lots of 1,000 they cost $18 additional. These checks when thrown out by the machine with the mint merchandise can be taken by the purchaser and replaced in the machine, at the money receptacle, and if the indicator happens to be set at any of the figures, 2 to 20, the machine will throw out the number of checks indicated on the dial when the lever is pulled, but will not throw out any merchandise unless a nickel is used. In addition to the dials indicated, is another large dial on which three columns are visible. In these three dials are figures of oranges, lemons, cherries and other symbols. They revolve with the release of the lever, when either money or a check is placed in the money receptacle and the lever pulled. It is contended that there is some amusement afforded by the moving of the various figures of these dials and the combinations formed of lemons, oranges and cherries, which also indicate how

many checks are going to be thrown out.

The history of the machine is that it was originally constructed for the use of the checks which were primarily designed to be redeemed in merchandise, and some years ago the checks were so printed as *"redeemable in merchandise."* Since the decision in several States that such form of operation constituted gaming, complainant contends that the *redeemable* feature of the checks in merchandise was abandoned, and the checks differently printed, or stamped, to conform to the new thought or legal requirement, without making any changes in the machine itself, but merely in the lettering on the checks and the method of conducting his business, namely, not redeeming the checks.

The complainant's contention in effect is that while the machine may have been originally constructed for use as a "still," he is using it as a *heating plant.*

It seems to me that as long as he uses it as a heating plant and not as a still, it cannot be seized or confiscated. The fact that it has in it latent temptations, does not of itself *outlaw* it. Human nature is a concentration of latent temptations, but may, by heroic effort, preserve its virtue, but it will bear watching, as it may break loose at any time. I think these machines, and this complainant, will be worthy of vigilant police observation, but so long as they preserve their virtue as vending machines *only*, they are not liable to seizure or confiscation.

In so far as the Attorney-General in his answer admits that the defendant has instructed his department and subordinates to *seize and confiscate* said machines, the defendant will be enjoined from so doing as an unlawful interference with the right of private property, when operated as testified to in this record.

Nothing in this opinion, however, is to be construed as meaning that if the vending machines of this complainant are found to be *illegally* operating, that the Police Department will be restrained from seizing and confiscating the machines and prosecuting criminally the offenders. The evidence thus far fails to show any *illegal* operation of the machines of the complainant. Gratuitously I may add that if the checks are redeemed in merchandise,

money or otherwise, by complainant or his agents, then under the authorities collected in the case annotated in 38 A. L. R., p. 71, the same would, in my judgment, be a *gambling device.* It was constructed along the lines of a gambling device, was originally ordained for that purpose, in the same way that a revenue cutter at once suggests it is part of the national defense, even though it has been sold and is being operated as a private yacht. When privately owned and operated it is not subject to the laws affecting revenue cutters. The same principle applies here. The channels in which gift enterprises may lawfully sail, has been definitely marked and its soundings taken by our Court of Appeals, whose *chart* will be found in Long vs. State, **74 Md.** 565. These vending machines, on the testimony in this case, are still wholly within the channel, but very close to the shoals and liable to go on the rocks by any ill considered movement. While they maintain their present course, capture and police confiscation, will be enjoined. Their further course will be watched with interest and apprehension, and General Gaither may be wholly justified in "viewing them with alarm" in their present cruise around the "near beer" ports of the town. These vending machines should be kept under constant police surveillance, but cannot, at *this stage*, be seized or confiscated. Even the *suspect is entitled* to equal protection of the constitutional guarantees of the laws of the Free State.

Let the injunction issue, limited as indicated.